*Electronically Filed*
*April 30, 2010*

NILE LEATHAM, ESQ.
Nevada Bar No. 002838
ELLIOTT R. EISNER, ESQ.
Nevada Bar No. 002821
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
E-Mail:  nleatham@klnevada.com
          eeisner@klnevada.com
          rhoward@klnevada.com
          ncox@klnevada.com

Attorneys for Plaintiff
**NEXBANK, SSB**

LENARD M. PARKINS, ESQ.
HENRY FLORES, ESQ.
TREVOR HOFFMANN, ESQ.
JONATHAN HOOK, ESQ.
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone No: (212) 659-7300
Facsimile No. (212) 884-8226
E-Mail:  Lenard.Parkins@haynesboone.com
          henry.flores@haynesboone.com
          trevor.hoffmann@haynesboone.com
          jonathan.hook@haynesboone.com

Attorneys for Plaintiff
**NEXBANK, SSB**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| In re:<br><br>FX LUXURY LAS VEGAS I, LLC,<br><br>Debtor. | CASE NO. BK-S-10-17015-bam<br><br>Chapter 11 |
| NEXBANK, SSB, as successor Second Lien Collateral Agent for the Second Lien Lenders,<br><br>Plaintiff,<br><br>- v –<br><br>LANDESBANK BADEN-WÜRTTEMBERG, NEW YORK BRANCH, as a First Lien Lender and as successor First Lien Collateral Agent for the First Lien Lenders,<br><br>Defendant. | Adv. Pro. No. _____<br><br><br>**COMPLAINT** |

Plaintiff NexBank, SSB ("NexBank"), in its capacity as the second lien collateral agent (the "Second Lien Agent") on behalf of the second lien lenders (the "Second Lien Lenders"), by its undersigned attorneys, alleges as follows:

## NATURE OF THE COMPLAINT

1. This Complaint is filed by NexBank, as second lien collateral agent, against defendant Landesbank Baden-Württemberg, New York Branch ("LBBW" and the "First Lien Defendant"), as a first lien lender and as first lien collateral agent (the "First Lien Agent) on behalf of the first lien lenders (the "First Lien Lenders," and together with the First Lien Agent, the "First Lien Parties"), seeking a declaratory judgment that, as a result of the First Lien Defendant's breach, or intended imminent breach, of the amended and restated intercreditor agreement (the "Intercreditor Agreement")[1] that was intended to govern the First Lien Parties' relationship with the Second Lien Agent and the Second Lien Lenders (collectively, the "Second Lien Parties"), the Second Lien Parties are no longer bound by the Intercreditor Agreement.

## PRELIMINARY STATEMENT

2. This Complaint arises from the First Lien Defendant's entry into a pre-petition lock-up agreement dated as of October 30, 2009 (as amended, the "Lock-Up Agreement") with, among others, the First Lien Parties, the Debtor and certain of the Debtor's largest controlling equity owners and insiders, to Refinance, Modify and extend the maturity date of the First Lien Parties' approximately $260 million pre-petition secured loan beyond the maturity date of the Second Lien Credit Agreement (defined below), without the consent of the Second Lien Parties.

3. Because the express terms of section 5.3 of the Intercreditor Agreement prohibit such a transaction (the "Prohibited Transaction"), the First Lien Defendant has attempted, by sleight of hand, to couch its transaction as a "new" loan to a "new" borrower. To accomplish this, the First Lien Defendant required the Debtor, pursuant to the terms of the Lock-Up Agreement, to commence a voluntary pre-packaged Chapter 11 bankruptcy case and pre-arranged

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Intercreditor Agreement.

728175 (7474-2)                                    - 2 -

"sale" of the Las Vegas real estate securing both the First Lien Parties' and Second Lien Parties' loans (the "Collateral") for a sum of approximately $260 million to a new single-purpose entity called LIRAPO – an entity controlled and owned 100% by Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino (the "Insiders"), the *same* individuals that own a controlling interest (*i.e.,* at least 73%) in FX Real Estate & Entertainment Inc. ("FXRE"), the Debtor's ultimate parent – with the "purchase price" (aside from a $19 million paydown by the Insiders) to be "financed" (*i.e.*, refinanced) by the First Lien Parties. Upon information and belief, interested party LIRA Property Owner, LLC ("LIRAPO") is a Delaware limited liability company.

4. Upon information and belief, Sillerman, Kanavos and Torino are directors, executive officers and/or control as beneficial owners approximately 73% of FXRE. FXRE is a publicly-listed Delaware corporation with a principal place of business located in New York, New York. Upon information and belief, FXRE owns, as its wholly-owned subsidiaries, FX I, FX II, FX Parent, and FXL (defined below). FX Luxury, LLC ("FXL") was, at all relevant times, a Delaware limited liability company with a principal place of business located in New York, New York. FXL was, at all relevant times, the successor-in-interest to FX Luxury Realty, LLC, and, was at all relevant times, a party-in-interest under the Intercreditor Agreement. Upon information and belief, FXL was, at all relevant times, the sole member of FX Parent.

5. The transaction embodied in the Lock-Up Agreement also offers the theoretical possibility of an auction of the Collateral for a sum equal to or greater than $256 million in cash plus closing costs and broker fees. This is pure optics, however. As disclosed in paragraph 30 of the *Omnibus Declaration of Mitchell J. Nelson Filed in Support of First Day Motions* (Docket No. 21), the estimated liquidation and adjusted carrying value of the Collateral was $137.7 million as of December 31, 2009. In this context, an auction with a required minimum cash bid of $256 million is illusory, designed simply to give the process a veneer of legitimacy, where there is none. *See also Motion for Order Pursuant to 11 U.S.C. 105(a), 363, and 365 (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Bankruptcy Estate; (B) Scheduling and Auction to Consider Competing Bids for the Assets; and (C) Approving the Form and Manner of Notice of the Auction* (Docket No. 20).

728175 (7474-2) - 3 -

6. The structure of the planned "sale" of the Collateral to the "new" entity through "financing" provided by the First Lien Parties is nothing more than a Modification and/or a Refinancing of the existing First Lien Debt in direct breach and contravention of Section 5.3 of the Intercreditor Agreement.

7. In reality, this is not a "new" $260 million loan -- it is a Refinancing and/or Modification of the First Lien Parties' $260 million pre-petition loan (when coupled with the $19 million paydown called for under the Lock-Up Agreement) for *exactly* the same amount that was outstanding under the pre-petition loan.  Moreover, while the "new" loan is ostensibly to a "new" borrower, the "new" borrower is simply a newly-created single-purpose entity, owned by the very same Insiders that controlled and owned the equity of the Debtor pre-petition.  Figure 1, below, compares the structure of the First Lien Parties' matured pre-petition loan with the "new" first lien loan contemplated under the Lock-Up Agreement.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

728175 (7474-2)

- 4 -



Figure 1

8. Thus, while structured under the guise of a "new" loan, the truth is that the transaction is a Refinancing and/or Modification of existing first lien debt expressly prohibited by section 5.3 of the Intercreditor Agreement.

9. Moreover, the Lock-Up Agreement, which required the Debtor to file this bankruptcy case, and which specifies the precise terms upon which the Debtor is required to

1  propose and seek confirmation of its pre-packaged liquidation plan (the "Plan") (which Plan was
2  filed pursuant to the Lock-Up Agreement by the Debtor on the first day of this case), guarantees
3  the Debtor's pursuit of the Prohibited Transaction via a fast-track bankruptcy case.  This is not a
4  placeholder plan intended to foster negotiations among creditors.  This is a done deal, negotiated
5  by the First Lien Parties and the Insiders for their own benefit, all at the expense of the Second
6  Lien Parties, other unsecured creditors and the non-Insider FXRE shareholders.

7        10.     As a result, and to avoid the certain harm to the interests of the Second Lien
8  Parties (including the loss of their Collateral and the loss of their right to be enfranchised to file a
9  Plan to treat all creditor claims through the bankruptcy process) that has resulted or will result
10 from the First Lien Defendant's violation of the Intercreditor Agreement, NexBank hereby seeks
11 a declaratory ruling by this Court that the transaction embodied in the Lock-Up Agreement
12 constitutes a breach of the Intercreditor Agreement, and that, as result of such breach, the Second
13 Lien Parties are no longer bound by the Intercreditor Agreement.

### THE PARTIES

15       11.     Plaintiff NexBank is a Texas state savings bank, with its principal place of business
16 in Dallas, Texas.  NexBank is the successor-in-interest to Credit Suisse, Cayman Islands Branch
17 ("Credit Suisse"), as Second Lien Agent for the Second Lien Lenders under the Second Lien
18 Credit Agreement (defined below) and the Intercreditor Agreement.  NexBank holds a claim
19 against the Debtor under the Second Lien Credit Agreement.

20       12.     Defendant LBBW, being sued in its capacity as a First Lien Lender and as the
21 successor-in-interest to Credit Suisse, as First Lien Agent under the First Lien Credit Agreement
22 (defined below) and the Intercreditor Agreement, is a German banking institution with an office
23 in New York, New York.  LBBW is a party to, and is bound by, the Intercreditor Agreement, and
24 is a signatory to the Lock-up Agreement giving rise to the claims set forth herein.  LBBW has a
25 claim against the Debtor under the First Lien Credit Agreement.

### JURISDICTION AND VENUE

27       13.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.
28 §§ 157(a), 157(b), 1334(b) and 2201(a).  This adversary proceeding (the "Adversary

728175 (7474-2)  - 6 -

Proceeding") relates to the above-captioned bankruptcy case (the "Bankruptcy Case") now pending before this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to 28 U.S.C. §1409(a), venue properly lies with this Court in this District, the district in which the Bankruptcy Case is pending.

14. For the reasons discussed in this Complaint, the adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O) as it pertains to, among other things, administration of the estate, allowance and disallowance of the First Lien Lenders' and Second Lien Lenders' claims and their relative rights under the Intercreditor Agreement.

15. Pursuant to section 8.6 of the Lock-Up Agreement, the First Lien Defendant agreed that, upon a bankruptcy filing by the Debtor, the United States District Court for the Bankruptcy Court for the District of Nevada would have exclusive jurisdiction over all matters arising out of or in connection with the Lock-Up Agreement.

**FACTS RELEVANT TO THE CLAIMS FOR RELIEF**

The First Lien Loan

16. Pursuant to an agreement dated May 11, 2007, and amended and restated on July 6, 2007 (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"), between BP Parent, LLC,[2] Metroflag BP, LLC[3] and Metroflag Cable, LLC[4]

---

[2] FX Luxury Las Vegas Parent, LLC ("FX Parent") was, at all relevant times, a Delaware limited liability company with a principal place of business located in New York, New York. FX Parent was, at all relevant times, the successor-in-interest to BP Parent, LLC, named as "Holdings" in the Intercreditor Agreement and was, at all relevant times, a guarantor and party-in-interest under the Intercreditor Agreement. Upon information and belief, FX Parent was, at all relevant times, the sole member of defendants FX I and FX II.

[3] FX Luxury Las Vegas I, LLC ("FX I" or the "Debtor") is a Nevada limited liability company with a principal place of business located in Las Vegas, Nevada. FX I, formerly known as Metroflag BP, LLC, is a "Borrower" under the First Lien Credit Agreement, the Second Lien Credit Agreement and the Intercreditor Agreement, and is a wholly-owned subsidiary of FXRE.

[4] Interested party FX Luxury Las Vegas II, LLC ("FX II") was, at all relevant times, a Nevada limited liability company with its principal place of business located in Las Vegas, Nevada. FX II, formerly known as Metroflag Cable, LLC, was, at all relevant times, also a "Borrower" under the First Lien Credit Agreement, the Second Lien Credit Agreement and the Intercreditor Agreement, and was also a wholly-owned subsidiary of FXRE. Upon information and belief, on November 5, 2009, FX II merged into FX I, with FX I remaining as the sole surviving entity. Upon information and belief, on November 5, 2009, following the merger of FX II into FX I, FX Parent merged into FX I. FX I is the surviving entity. For the purposes of this Complaint, all allegations will reference the parties as they exist now.

728175 (7474-2)                                                     - 7 -

(collectively, with their respective successors-in-interest as detailed herein, the "Borrowers"), the First Lien Lenders, and Credit Suisse as the First Lien Administrative Agent and the First Lien Collateral Agent for the First Lien Lenders, the First Lien Lenders made a loan of $280,000,000 (the "First Lien Loan") to the Borrowers.  A true and correct copy of the First Lien Credit Agreement is annexed hereto as **Exhibit "A,"** and is incorporated by reference herein.

17. Under the terms of the First Lien Credit Agreement, the Debtor was obligated to repay the entire principal amount thereof, unpaid interest thereon, and all other amounts owed thereunder, on or before July 6, 2008, the date the First Lien Loan was initially scheduled to mature.

18. Pursuant to Section 2.12 of the First Lien Credit Agreement, the Borrowers extended the maturity of the First Lien Loan to January 6, 2009.

19. The First Lien Loan is secured by, *inter alia*, a deed of trust on real property located in Las Vegas, Nevada (the "Collateral"), pursuant to a First Lien Deed of Trust, a Security Agreement, an Assignment of Rents and Leases and a Fixture Filing executed by the Borrowers on May 11, 2007 (the "First Lien Trust Deed").

20. On or about December 22, 2008, LBBW became the successor-in-interest to Credit Suisse as the First Lien Collateral Agent and, upon information and belief, is the current beneficiary under the First Lien Trust Deed.

The Second Lien Loan

21. Pursuant to an agreement dated May 11, 2007, and amended and restated on July 6, 2007 (as amended, supplemented or otherwise modified, the "Second Lien Credit Agreement"), by and among the Borrowers, the Second Lien Lenders and Credit Suisse, Cayman Islands Branch, serving as the Second Lien Agent, the Second Lien Lenders extended a secured second lien loan in the amount of $195,000,000 (the "Second Lien Loan") to the Borrowers.  A true and correct copy of the Second Lien Credit Agreement is annexed hereto as **Exhibit "B,"** and is incorporated by reference herein.

22. The Second Lien Loan was secured by, *inter alia*, a second deed of trust on the Collateral, pursuant to a Second Lien Deed of Trust, a Security Agreement, an Assignment of

Rents and Leases and a Fixture Filing executed by the Borrowers on May 11, 2007 (the "Second Lien Trust Deed"). As with the First Lien Loan, the Second Lien Loan was initially scheduled to mature on July 6, 2008, which maturity date was extended through January 6, 2009.

The Intercreditor Agreement

23. On or about July 6, 2007, the Borrowers, Credit Suisse, acting as both the First Lien Collateral Agent and the Second Lien Collateral Agent, and FX Parent, entered into an amended and restated intercreditor agreement (the "Intercreditor Agreement"). A true and correct copy of the Intercreditor Agreement is annexed hereto as **Exhibit "C"** and is incorporated by reference herein.

24. The Intercreditor Agreement was intended to establish the rights and obligations between the First Lien Lenders, the First Lien Collateral Agent, on behalf of itself and the First Lien Lenders, the Second Lien Lenders and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Lenders, including lien priorities and the enforcement of remedies with respect to the Collateral.

25. The parties to the Intercreditor Agreement acknowledged that the First Lien Loan is "secured on a first priority basis by liens on substantially all the assets" of the Borrowers, while the Second Lien Loan is "secured on a second priority basis" by liens in the same assets, namely, the Collateral.

26. The First Lien Parties and the Second Lien Parties further agreed that until the discharge of the First Lien Loan obligations in full:

>  (i) the First Lien Collateral Agent or the First Lien Lenders could enforce rights and exercise remedies without consulting the Second Lien Collateral Agent or the Second Lien Lenders;
>
>  (ii) the Second Lien Collateral Agent and the Second Lien Lenders could not enforce rights and exercise remedies except after a certain standstill period, and only if the First Lien Agent or the First Lien Lenders were not diligently enforcing rights and exercising remedies;
>
>  (iii) the Second Lien Collateral Agent and the Second Lien Lenders could not "contest, protest, or object to" any foreclosure proceeding or action brought by the First Lien Collateral Agent or the First Lien Lenders, or "any other exercise" by the latter "of any rights and remedies relating to the Collateral"; and

      (iv)  upon an exercise of remedies, the Collateral and any proceeds thereof shall first be applied in accordance with the First Lien Loan documents, and, upon discharge of that First Lien Loan, in accordance with the Second Lien Loan documents.

(*See* Ex. C, the Intercreditor Agreement, Section 3.1.)

27. While Section 3.1 of the Intercreditor Agreement provides the First Lien Parties with the right to exercise certain of their remedies first, Section 5.3 of the Intercreditor Agreement provides a material and fundamental check on what actions the First Lien Parties may and may not take. Specifically, Section 5.3 protects the Second Lien Parties against any modification, refinancing, replacement or substitution (or the like) of the First Lien Debt beyond the scheduled Maturity Date of the Second Lien Credit Agreement.

> 5.3 <u>Amendments to First Lien Loan Documents and Second Lien Loan Documents</u>.
>
> (a) The First Lien Loan Documents [including the First Lien Credit Agreement] may be Modified[5] in accordance with their terms and the First Lien Credit Agreement may be Refinanced[6] . . . <u>provided</u> that . . . ***any such Modification, replacement or Refinancing shall not***:
>
>     (1)  contravene the provisions of this Agreement; . . .
>
>     (4)  ***extend the scheduled maturity of the First Lien Credit Agreement or any Refinancing thereof beyond the scheduled maturity of the Second Lien Credit Agreement or any permitted Refinancing thereof*** . . . .

(*See* Ex. C, the Intercreditor Agreement, Section 5.3) (emphasis added).

28. The Second Lien Collateral Agent and the Second Lien Lenders relied on these material protective provisions of the Intercreditor Agreement as a check on and limitation of the rights and powers afforded to the First Lien Parties thereunder.

<u>The Breach of the Intercreditor Agreement</u>

---

[5] *Modifications* are defined in the Intercreditor Agreement as "any amendments, restatements, amendments and restatements, supplements, modifications, waivers, renewals, replacements, consolidations, severances, substitutions and extensions, of any document or instrument from time to time; 'Modify', 'Modified', or related words shall have meanings correlative thereto." (*See* Intercreditor Agreement § 1.1.)

[6] *Refinance* is defined in the Intercreditor Agreement as "in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. 'Refinanced' and 'Refinance' have meanings correlative thereto." (*See* Intercreditor Agreement § 1.1.)

728175 (7474-2)      - 10 -

29. The First Lien Loan matured on the Maturity Date and remains unpaid. As a result, interest, costs and fees continued to accrue against the Borrowers on the First Lien Loan until the Petition date.

30. The Second Lien Loan matured on the Maturity Date and remains unpaid. As a result, interest, fees and costs continued to accrue against the Borrowers on the Second Lien Loan until the Petition date.

31. The failure to pay the First Lien Loan and the Second Lien Loan by the Maturity Date constituted events of default by the Borrowers under both the First Lien Credit Agreement and the Second Lien Credit Agreement.

32. A foreclosure sale of the Collateral by the First Lien Trustee on behalf of LBBW was originally scheduled for September 9, 2009. The foreclosure date was subsequently adjourned and re-noticed several times while the parties to the Original Lock-Up prepared for the Debtor's bankruptcy filing.

33. Upon information and belief, from at least September 2009 through October 30, 2009 and beyond (the "Lock-Up Negotiations Period"), LBBW, on behalf of itself and the First Lien Lenders, began negotiating with the Borrowers, FX Parent and the Insiders (*i.e.*, Sillerman, Kanavos and Torino) to Modify and/or Refinance the debt due under the First Lien Credit Agreement by extending the maturity of the First Lien Credit Agreement beyond the maturity date of the Second Lien Credit Agreement, a transaction in direct violation of the Intercreditor Agreement.

34. Upon learning of the negotiations, counsel for NexBank advised the First Lien Parties' counsel, both orally and in writing, that the First Lien Lenders were prohibited from negotiating any agreements in violation of, or which otherwise circumvented, Section 5.3 of the Intercreditor Agreement. A true and correct copy of a letter sent to counsel for the First Lien Parties by counsel for NexBank is attached hereto as **Exhibit "D."**

35. Upon information and belief, during the Lock-Up Negotiations Period, the First Lien Parties engaged in the negotiations seeking agreement as to the terms of the Lock-Up Agreement with, among others, the Debtor's controlling Insiders (Sillerman, Kanavos and Torino) or their

representatives, the Borrowers' members (through the Debtor's president, Mitchell Nelson), other members of FXRE's board of directors, and certain of FXRE's officers. These terms ultimately formed the basis for the executed Lock-up Agreement, as well as for the Plan filed with Bankruptcy Court on the first day of the Debtor's bankruptcy case.

36. The structure of the planned sale of the Collateral to LIRAPO through financing provided by the First Lien Lenders is nothing more than a Modification and/or a Refinancing of the existing First Lien Debt in direct breach and contravention of Section 5.3 of the Intercreditor Agreement. No matter what LBBW and the Insiders call it, it is a scheme to replace and refinance the same obligations owed by the Debtor to the First Lien Lenders into a "new" facility with a "new" single-purpose entity owned and controlled by the same Insiders that now control the Debtor and FXRE and created especially for the purpose of circumventing Section 5.3 of the Intercreditor Agreement. It is an end-run effort to evade the bargained-for protections accorded to the Second Lien Lenders under the Intercreditor Agreement, and is a breach thereof.

37. Despite their knowledge that the implementation of the Lock-up Agreement would wipe out the Second Lien Lenders and other unsecured claims *in toto* and would constitute a breach of the Intercreditor Agreement, on or about October 30, 2009, LBBW, the Borrowers and Holdings entered into the Lock-up Agreement with LIRAPO and LIRA (both of which are owned by Sillerman, Torino and Kanavos). Upon information and belief, interested party LIRA LLC ("LIRA") is a Delaware limited liability company. Upon information and belief, LIRA is an entity affiliated with and/or controlled by Sillerman, Kanavos and Torino and was created to implement the transactions complained of in this Complaint.

38. The Lock-Up Agreement (as amended) refinances the First Lien Lenders' existing approximately *$260 million* pre-petition loan upon the following terms:

- The Debtor must commence a voluntary prepackaged chapter 11 bankruptcy proceeding on by April 20, 2010.

- The Debtor (owned/controlled by the *Insiders*) must sell the Property either:

    (i) pursuant to an auction sale with a minimum cash bid of $256 million, or if the auction sale is not completed, then

(ii) pursuant to a prearranged sale to LIRAPO (a new single purpose entity *owned 100% by the Insiders*), for *$260 million*, to be financed by the *First Lien Lenders*, following a $19 million paydown by or on behalf of LIRAPO, under the terms of a prepackaged chapter 11 bankruptcy plan of reorganization.

39. As discussed below, because the Lock-Up Agreement was structured to benefit the Insiders, they directed the actions of FXRE (via its "disinterested" directors) and the Debtor in entering the Lock-Up Agreement which provides for the sale of the Collateral to their controlled entity, LIRAPO, wiping out the interests of the Debtor and the claims of the Second Lien Lenders in the process.

40. On November 5, 2009, FXRE filed a Form 8-K with the United States Securities and Exchange Commission. The Form 8-K, dated as of October 30, 2009, was filed to report the entry into and execution of the Lock-Up Agreement. A true and correct copy of the Form 8-K is annexed hereto as **Exhibit "E"** and is incorporated by reference herein. Specifically, the Form 8-K provides in part:

> On October 30, 2009, FX Real Estate and Entertainment Inc. s [sic] (the "Company") Las Vegas subsidiaries entered into a Lock Up and Plan Support Agreement (the "Lock Up Agreement") with the first lien lenders under the Las Vegas subsidiaries $475 million mortgage loans, and two corporate affiliates (LIRA Property Owner, LLC and its parent LIRA LLC; collectively, the "Newco Entities") of Robert F.X. Sillerman, Paul C. Kanavos and Brett Torino, who are directors, executive officers and/or greater than 10% stockholders of the Company (the "Newco Entities Equity Sponsors").

(*See*, Ex. E, Form 8-K at Item 1.01, p. 1.). The Lock-Up Agreement was amended on April 16, 2010 to, among other things, revise the dates by which various phases of the transaction must be completed. A copy of the amended Lock-Up Agreement filed with FXRE's 8-K filed on April 16, 2010 is annexed hereto as **Exhibit "F."**

41. The Form 8-K goes on to describe the terms and provisions of the Lock-Up Agreement and the proposed sale of the Collateral and alternative plan of liquidation to be implemented by LBBW and the other First Lien Lenders who will be providing refinancing, substitute and replacement debt for the existing First Lien Debt on the Collateral.

. . .

42. The entry into and execution of the Lock-up Agreement embodies a transaction that is a clear breach and violation of the Intercreditor Agreement. It contractually binds the First Lien Defendant and the Debtor to wipe out the Second Lien Lenders and other unsecured creditors through a refinancing and extension of the First Lien Debt by the First Lien Parties that is prohibited pursuant to Section 5.3 of the Intercreditor Agreement.

43. Upon information and belief, the First Lien Lenders' entry in the Lock-Up Agreement was done with intent to harm, and has harmed, the Second Lien Lenders by stripping them of the protections afforded them under the Intercreditor Agreement.

44. The Form 8-K further describes the complicity of the "disinterested directors" of FXRE by describing their conduct as follows:

> Because the Lock Up Agreement and the transactions contemplated thereby involve the Newco Entities Equity Sponsors, who are directors, executive officers and/or greater than 10% stockholders of the Company, a majority of the Company's disinterested directors authorized the Las Vegas subsidiaries to enter into the Lock Up Agreement and consummate the transactions contemplated thereby.

(*See*, Ex. E, Form 8-K at Item 1.01, p. 2.)

45. Thus, as described in the Form 8-K, because the Insiders were getting the value under the Lock-Up Agreement, the Borrowers and FXRE had to act through its "disinterested directors" to facilitate the Lock-up Agreement for no consideration whatsoever. Indeed, the Form 8-K provides that the interests of the Borrowers along with the Second Lien Lenders will be extinguished *in toto* by virtue of the actions taken by the various parties to the Lock-up Agreement.

46. On November 12, 2009, following LBBW's and the other parties' entry into the Lock-Up Agreement, NexBank filed a Complaint in the Southern District of New York for, among other things, breach of the Intercreditor Agreement against LBBW and the First Lien Lenders.

47. Thereafter, NexBank and the Second Lien Lenders entered into settlement negotiations with, among others, the First Lien Defendant.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

48.	In connection with the settlement negotiations, NexBank agreed to, and on January 4, 2010 did, enter into a stipulation to voluntarily dismiss its Complaint, without prejudice.

49.	Ultimately, the parties' settlement negotiations failed, and were officially terminated on March 18, 2010.

50.	On April 14, 2010, certain of the Second Lien Parties sent the First Lien Defendant a letter advising them that the Lock-Up Agreement embodies a transaction that would constitute a breach of the Intercreditor Agreement, and demanding that the First Lien Defendant abandon and cease all acts in furtherance of the Lock-Up Agreement. A copy of the April 14 letter is annexed hereto as **Exhibit "G."**

51.	On April 20, 2010, the First Lien Defendant responded to the Second Lien Parties by letter, rejecting the Second Lien Parties' demands. A copy of the April 20 letter is annexed hereto as **Exhibit "H."**

52.	On April 21, 2010, the Debtor filed this bankruptcy case and the Plan, each as required under the terms of the Lock-Up Agreement to implement this transaction.

## **REQUEST FOR DECLARATORY JUDGMENT**

**(Against Defendant LBBW as a First Lien Lender and as First Lien Collateral Agent)**

53.	NexBank repeats the allegations contained in paragraphs 1 through 50 of the Complaint as if fully set forth herein.

54.	Pursuant to the terms and conditions of Section 5.3 of the Intercreditor Agreement, the First Lien Defendant is prohibited from entering into agreements to Modify or Refinance of the First Lien Loan in a manner which would extend the First Lien Credit Agreement or result in a Refinancing or Modification of the First Lien Loan beyond the maturity date of the Second Lien Credit Agreement. Section 5.3 of the Intercreditor Agreement was a material and fundamental term thereof.

55.	Despite this prohibition, as described above, the First Lien Defendant entered into the Lock-up Agreement, which effectively Modifies or Refinances the First Lien Loan in a manner that extends the First Lien Credit Agreement and is a Refinancing or Modification of the

1  First Lien Debt beyond the maturity date of the Second Lien Credit Agreement and constitutes a

2  material and fundamental breach of the Intercreditor Agreement.

3        56.    The First Lien Defendant disputes NexBank's contention that its entry into the

4  Lock-up Agreement constitutes a breach of the Intercreditor Agreement.

5        57.    On account of the foregoing, there exists between NexBank and First Lien Defendant a present, actual, justiciable and genuine controversy in respect of which NexBank is entitled to have a declaration of its rights and further relief as may be just and proper. This controversy is ripe for adjudication at this time since the Debtor, its controlling Insiders and the First Lien Defendant are trying to close this transaction through a pre-packaged plan that is on a fast track to confirmation.

11       58.    By reason of the foregoing, NexBank is entitled to have judgment entered pursuant to 28 U.S.C. § 2201 *et seq.*, declaring that: (i) the Refinancing, replacement and/or Modification of the First Lien Loan Obligations embodied in the Lock-up Agreement constitutes a breach of the Intercreditor Agreement; and that (ii) by virtue of First Lien Defendant's breach of the material and fundamental terms of the Intercreditor Agreement, NexBank is no longer bound by the Intercreditor Agreement.

### **PRAYER FOR RELIEF**

**WHEREFORE**, NexBank demands judgment thereon be rendered as follows:

(A)     On Request for Declaratory Judgment as against defendant LBBW as a First Lien Lender and First Lien Collateral Agent, judgment entered pursuant to 28 U.S.C. § 2201 *et seq.*, declaring that: (i) said parties breached the Intercreditor Agreement by entering the Lock-up Agreement; and (ii) by virtue of the material breach of the Intercreditor Agreement as alleged

23 . . .
24 . . .
25 . . .
26 . . .
27 . . .
28 . . .

728175 (7474-2)         - 16 -

herein, NexBank and the Second Lien Lenders are no longer bound by the Intercreditor Agreement; and

  (B) For such other and further relief as this Court may deem just and proper.

Dated this 30th day of April, 2010.

By: /s/ Natalie M. Cox
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
ELLIOTT R. EISNER, ESQ.
Nevada Bar No. 002821
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
   and
LENARD M. PARKINS, ESQ.
HENRY FLORES, ESQ.
TREVOR HOFFMANN, ESQ.
JONATHAN HOOK, ESQ.
**HAYNES AND BOONE, LLP**
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone No: (212) 659-7300
Facsimile No. (212) 884-8226

Attorneys for Plaintiff
**NEXBANK, SSB**

728175 (7474-2)

- 17 -